UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| HENRY L. WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:03-CV-348-TS |
| | ) | |
| CSX TRANSPORTATION, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

This matter is before the Court on the Motion in Limine to Exclude Testimony of Dr. Robert O. Andres and Dr. John J. Dwyer [DE 28], filed by the Defendant, CSX Transportation, Inc., (CSX or CSXT) on October 29, 2004.

The Plaintiff, Henry L. Williams, has filed this action under the Federal Employers Liability Act, 45 U.S.C. §§ 51–50 ("FELA"), seeking damages for carpal tunnel syndrome (CTS) of the hands and arms allegedly sustained during his employment with CSX. He wishes to present Dr. Andres and Dr. Dwyer as his expert witnesses at trial.

The Defendant contends that the prospective testimony of Dr. Andres and Dr. Dwyer does not meet the standard set forth in Federal Rule of Evidence 702 as interpreted by the United States Supreme Court and *Daubert v. Merrell-Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

**MOTIONS IN LIMINE**

"Federal district courts have the power to exclude evidence in limine pursuant to their authority to manage trials." *Charles v. Cotter*, 867 F. Supp. 648, 655 (N.D. Ill. 1994) (citing *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984)). Courts have this power to exclude evidence only when

evidence is clearly inadmissible on all potential grounds. *Partners v. AT&T Techs.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993). Ruling may be deferred until trial and denial of a motion in limine does not necessarily mean that all evidence contemplated by the motion will be admitted at trial. *Id.*

Courts commonly resolve reliability issues at in limine evidentiary (*Daubert*) hearings when the admissibility of expert testimony is challenged. Weinstein on Evidence, § 702.02[6][b].

**RULE 702 AND *DAUBERT* STANDARD**

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), courts must act as gatekeepers to ensure that expert testimony satisfies the admissibility requirements of Federal Rule of Evidence 702. Expert testimony based on scientific, technical or other specialized knowledge must be relevant and reliable. *See id.* The testimony must be "based upon sufficient facts or data," "the product of reliable principles and methods," and the witness must have "applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Certain guidelines aid the court in its gatekeeping function, including whether the expert's "theory or technique . . . can be (and has been) tested," whether it "has been subjected to peer review and publication," whether there is a high "known or potential rate of error," whether there are "standards controlling the technique's operation," and whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." *Daubert*, 509 U.S. at 593–94. Even when the expert's opinion is derived from experience or training these guidelines are applicable. *See Clark v. Takata Corp.*, 192 F.3d 750, 758 (7th Cir.1999).

"Although the court must decide questions of admissibility, the weight and credibility to be accorded expert testimony is properly left to the jury." *Contractor Util. Sales Co. v. Certain-teed*

*Prods. Corp.*, 638 F.2d 1061, 1085 n.32 (7th Cir. 1981). The Defendant will have the opportunity to expose those weaknesses at trial and, as the court in *Daubert* stated, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## ANALYSIS

**A.     Dr. Robert Andres**

The Defendant moves the Court to exclude the testimony of Dr. Robert Andres, who has been retained by the Plaintiff as an expert in the field of ergonomics and bioengineering. Dr. Andres lists his conclusions and opinions at the end of his preliminary report, prepared on June 20, 2004. Dr. Andres states that he reached the following conclusions based on his review of the materials provided, site inspections, and his background in ergonomics:

> 1) Mr. Williams has a medical history consistent with exposure to ergonomic risk factors for the upper extremity.
>
> 2) Mr. Williams has been exposed to ergonomic risk factors for the upper extremity, particularly exerting force in awkward postures (throwing switches, coupling air hoses, and setting and releasing hand brakes), and riding on the side of vibrating cars. If this work did not solely cause his CTS, it at least contributed to it.
>
> 3) CSXT did not perform an ergonomic workside or job analysis of any of the jobs that Mr. Williams performed prior to his surgeries.
>
> 4) Mr. Williams never received ergonomic training concerning the upper extremity beyond safety meetings or on the job. He was not trained to recognize upper extremity ergonomic risk factors in his jobs or how to minimize their effect. He was not trained to recognize early symptoms of CTS, nor was he encouraged to report these symptoms at their onset.

3

> 5) CSXT has not implemented any comprehensive plan to control the hazards of exposure to upper extremity ergonomic risk factors for trainmen like Mr. Williams.

(Prelim. Report of Dr. Andres at 21.) Dr. Andres further states that he holds the following opinions "within a reasonable degree of scientific certainty":

> 1) Mr. Williams was exposed to documented ergonomic risk factors for the upper extremity. These risk factors included forceful exertions, vibrations, and awkward postures.
>
> 2) Exposure to upper extremity forceful exertions and awkward postures has been associated with the development of CTS.

*Id.* In conclusion, Dr. Andres states that based on these conclusions and scientific opinions, he has reached the following professional ergonomic opinions:

> 1) CSXT should have but did not perform comprehensive worksite and job evaluations for upper extremity ergonomic risk factors to which trainmen like Mr. Williams were exposed. If such analyses had been completed, or if CSXT had heeded previous research, CSXT should have known that some of these job tasks increased the risk of WMSDs[1] for workers such as Mr. Williams, and systematic control strategies should have been implemented.
>
> 2) CSXT should have but did not provide adequate training to Mr. Williams to empower him to minimize his exposure to upper extremity ergonomic risk factors and to recognize early signs and symptoms of upper extremity musculoskeletal disorders.

*Id.* Dr. Andres' supplemental report, prepared on February 22, 2005, adds these conclusions:

> 1) The analyses I performed for my preliminary report do not change as a result of my review of Dr. Brown's[2] videotapes taken at Defiance, OH on 10/18/04 and 10/19/04. In fact, the videotapes confirm my results.

---

[1] WMSD stands for "work-related musculoskeletal disorder."

[2] Dr. Todd Brown is CSX's ergonomist.

4

      2)      CSXT had ample data (thousands of CTS claims) that a reasonable employer would have used to institute a comprehensive ergonomics program as described by OSHA, the National Safety Council, NIOSH, and the AAR.

(Supplemental Report of Dr. Andres at 2.) Dr. Andres further states that these additional conclusions have not changed the opinions listed in his report. *Id.*

The Plaintiff clarifies in his Response that Dr. Andres' proposed testimony is not related to the medical cause of the Plaintiff's injuries: "Dr. Andres does not propose to testify that plaintiff's working conditions at CSX actually caused the plaintiff to develop carpal tunnel syndrome. Rather, his testimony will be that Mr. Williams was exposed to ergonomic risk factors that have been associated with the development of carpal tunnel syndrome." (Pl's Resp. at 9.) "In an ergonomic investigation, Dr. Andres is interested in the occupational risk factor, not the personal risk factors." *Id*. at 6 (citing Andres Dep. at 70). Dr. Andres states in his deposition,

> I'm not really offering an opinion as to the medical cause. My opinions have to do with his exposure to documented ergonomic risk factors that have been associated with the adverse health outcome of carpal tunnel syndrome, and so I'm doing that on the basis of my background in ergonomics, both as a researcher and as a practitioner.

*Id*. at 8–9 (citing Andres Dep. at 7–8).

One of the Defendant's arguments against Dr. Andres is that he is not qualified to provide expert testimony as to a diagnosis or medical causation of CTS. Because both the Plaintiff and Dr. Andres have stated that he will not testify as to causation, the Defendant's argument on this point, and its reliance on *Stasior v. National Railroad Passenger Corp.*, 19 F. Supp. 2d 835 (N.D. Ill. 1998), are irrelevant.

The Defendant's remaining argument against Dr. Andres is that he is not qualified to testify as an ergonomist in this case, as he did not perform an individualized assessment of duration and

5

frequency of the Plaintiff's exposure to documented ergonomic risk factors, as required in FELA carpal tunnel cases.

To resolve this issue, the Court reviews the research and methodology Dr. Andres used in forming the opinions and conclusions cited above. In brief, Dr. Andres reviewed the Plaintiff's medical history, briefs and depositions filed in this case, the Plaintiff's personal file, and numerous ergonomic studies related to CTS and railroad workers like the Plaintiff. *See id.* at 3–5. He screened for ergonomic risk factors present in several of the job tasks performed by workers like the Plaintiff. He performed systematic observational analysis or ergonomic risk factors present in several of the job tasks performed by workers like the Plaintiff. He also benchmarked CSXT's ergonomic efforts compared to the accepted best practices of reasonable industrial employers. Dr. Andres reviewed health and safety data, noting that CSX had received more than 4,800 CTS claims between 1993 and November 1, 2002. Furthermore, Dr. Andres visited twelve to fifteen CSX railroad yards within a three or four month period in the second half of 2004 and observed CSX trainmen and conductors at work.

Dr. Andres did not find it necessary to visit the Defiance, OH, site, where the Plaintiff worked, in order to prepare his report or testify in this case. Several factors play into his decision whether to perform a site inspection in a particular case. He would insist on seeing a site if the job is one he does not have video footage of, or uses equipment he has not seen before. But in situations where the occupation and job duties involved are ones that he has observed before, Dr. Andres does not feel compelled to go and see the same thing again. Dr. Andres testified that work on Class 1 railroads is extremely consistent across the country. He has observed trainmen like the Plaintiff perform their jobs in numerous railroad yards since 1993.

Since he prepared his report, Dr. Andres has viewed twelve videotapes taken by the Defendant's ergonomist, Dr. Todd Brown, on a site inspection at Defiance, OH, on October 18 and 19, 2004. Dr. Andres concluded from reviewing these tapes that the trainmen at this site perform tasks in the same manner he has grown accustomed to seeing at other CSX locations and other railroads across the country. Dr. Andres did not attempt to confirm or deny Dr. Brown's count of the number of times a task was performed or the amount of time it took to do each task. His observations confirmed the conclusions he had reached in his report: that the Plaintiff was exposed to ergonomic risk factors for the upper extremities.

In addressing the Defendant's charge that Dr. Andres is unqualified to testify as an expert in this case, the Court is mindful of other instances where courts have evaluated similar challenges to Dr. Andres' testimony. A district court in Ohio denied a railway's *Daubert* challenge and found that "Dr. Anders is an acknowledged expert in ergonomic bioengineering" and qualified to give expert testimony as to the plaintiff's CTS. *Aparicio v. Norfolk & W. Ry. Co.*, 874 F. Supp. 154, 159 (W.D. Ohio 1994). On appeal, the Sixth Circuit, summarized Dr. Andres' testimony:

> Dr. Robert Andres, Aparicio's ergonomics expert, shows that there were ergonomic risk factors and known remedial measures that had been described and accepted by the scientific community. This information was widely published in trade and scientific journals. A jury could accept Dr. Andres' testimony and find that a reasonably prudent employer would have known about the risk factors and taken steps to ameliorate them. . . .
>
> Dr. Andres testified as to the risk factors accepted in the biomechanical and ergonomics community for upper extremity cumulative trauma disorders such as carpal tunnel syndrome. . . . Dr. Andres also testified that an industrial employer like Norfolk & Western [Railroad Company] would learn of these ergonomic risk factors, as well as of methods of determining whether an employee was exposed to a risk of injury and methods of amelioration, through scientific and professional publications, trade journals and industry publications. Further, Dr. Andres stated that an employer like Norfolk & Western would know of the ergonomic literature through its medical

7

      department or safety person.

*Aparicio v. Norfolk & W. Ry. Co.*, 84 F.3d 803, 811–12 (6th Cir. 1996).

    CSX unsuccessfully challenged Dr. Andres' expert testimony in *CSX Transportation, Inc., v. Miller*, 858 A.2d 1025 (Md. Ct. Spec. App. 2004). *See also Rita Crites-Rhoe v. CSX Transportation* (Pl's Resp., Exh. 8.). In that case, CSX "expressly agree[d] that Dr. Andres is a qualified ergonomist. *Miller*, 858 A.2d at 1060. However, CSX argued that Dr. Andres was not qualified to testify to the particulars of that case.

    At trial, Dr. Andres' testimony was offered primarily to prove: "1) the existence of ergonomic risk factors to the lower extremities of employees in railroad yards, 2) the existence of known remedial measures to ameliorate those ergonomic risks, and 3) CSX's knowledge of both the ergonomic risks and the available remedial measures." *Id.* at 1074. On appeal, CSX complained that this testimony should have been excluded, as Dr. Andres "'had never observed a conductor for one full day' and that he 'did not quantify how many times Miller or any yard conductor performed a task or activity in a given day.'" *Id.* at 1075. However, the appellate court noted that Dr. Andres had visited some CSX yards in the Baltimore areas and that over the past six to seven years had observed conductors like the plaintiff at work in yards for up to three hours at a time. The court found that Dr. Andres' testimony was reliable even though he had not observed someone in the plaintiff's job for an entire day; it was enough to make generalizations based on a representative sample of a conductor's activities. *Id.* at 1076.

    Dr. Andres' preparation and opinions in *Miller* are strikingly similar to his preparation and opinions in the present case. While the Defendant emphasizes that Dr. Andres has not observed the Plaintiff at work and has not visited the CSX site at which the Plaintiff worked, it does not offer any

8

response to Dr. Andres' claim that this investigation was not necessary. Dr. Andres has testified that in his extensive experience visiting CSX facilities, he has noted remarkable consistency from yard to yard and from trainman to trainman. Furthermore, Dr. Andres has testified that reviewing Dr. Todd Brown's report and videotapes have confirmed that the Plaintiff's working conditions and duties were consistent with his experience.

The Defendant relies heavily on the one case, it appears, where it has successfully challenged Dr. Andres' expert testimony: *Pretter v. Metro North Communter Railroad Co.*, 206 F. Supp. 2d 602 (S.D.N.Y. 2002). The Defendant suggests that this is "the most important decision for the present case." In response, the Plaintiff describes *Pretter* as an outlier, as Dr. Andres has been permitted to testify at trial on more than twenty occasions.

The court in *Pretter* found Dr. Andres' methodology and research deficient, as he had relied "on impressions and extrapolations derived from his brief and casual visual inspection and videotaping of the work functions at issue." *Id.* at 604. "These deficiencies, moreover, were exacerbated, rather than cured, by the only other 'empirical' data on which Dr. Andres relied, to wit, plaintiff's own vague, conclusory, and self-serving statements." *Id.* The *Pressler* court, for unstated reasons, "ignored the testimony of defendant's expert and eschewed any evaluation of Dr. Andres' own credibility" in reaching its conclusion. *Id.*

However, in this case, the Court recognizes Dr. Andres' impressive credentials and the fact that the Defendant has elsewhere admitted that he is an expert ergonomist. Unlike in *Pressler*, in this case Dr. Andres' has not relied on "on impressions and extrapolations derived from . . . brief and casual visual inspection and videotaping" and he has not based his testimony largely on the Plaintiff's "vague, conclusory, and self-serving statements." Over the years, Dr. Andres has made

9

countless visits to CSX and other railyards and observed trainmen. Additionally, he has studied the Defendant's ergonomist's report and reviewed all the videotape the Defendant's expert saw fit to take. As the Defendant does not suggest that its own expert casually videotaped the Plaintiff's workplace, the Court assumes that these tapes were thorough and adequately represented the Plaintiff's work conditions. Dr. Andres states that Dr. Brown's report only confirms his conclusions. Significantly, the Defendant does not rebut this claim.

In brief, the Court finds that Dr. Andres is an ergonomist whose credentials and research qualify him to give expert testimony on the Plaintiff's behalf in this cause. The Court agrees with those courts that have found in similar cases that Dr. Andres was qualified to testify as to the existence of ergonomic risk factors that have been associated with the development of CTS, the existence of known remedial measures to ameliorate those ergonomic risks, and the Defendant's knowledge of both the ergonomic risks and the available remedial measures. The flaws perceived by the Defendant in Dr. Andres' methodology go to weight, not admissibility. The Defendant's motion to exclude Dr. Andres' testimony will be denied.

**B.     Dr. James J. Dwyer, M.D.**

The Defendant also moves the Court to strike the testimony of Dr. James J. Dwyer, the Plaintiff's sole expert on causation. Dr. Dwyer, a board certified orthopedic surgeon, would testify at trial that he has concluded, to a reasonable degree of medical certainty, that the Plaintiff's job at CSX caused his CTS.

In formulating his opinions in this matter, Dr. Dwyer reviewed Williams' medical records from Dr. Bhupendra Shah, Dr. Milton Morgan, Dr. Alfred Stoall, and Dr. William LaSalle. He also

10

reviewed the Plaintiff's deposition testimony and Dr. Andres' report. Dr. Dwyer performed a differential diagnosis, a method by which he considered all relevant potential causes of the Plaintiff's symptoms and then eliminated alternative causes based on a physical examination, clinical tests, and a thorough case history.

The Defendant makes two argument against admitting Dr. Dwyer's testimony. First, the Defendant argues that his testimony is inadmissible because of his admission that he does not address "eitology," or causation, in his report. Second, the Defendant argues that Dr. Dwyer's testimony is unreliable because he relies on Dr. Andres' flawed methodology.

The Defendant's first argument is disingenuous. Despite Defendant's attorney Bruce Hugon's best efforts at the Plaintiff's deposition, to which the Plaintiff's attorney Laurence Acker repeatedly and correctly objected, Dr. Dwyer clearly stated during both direct- and cross-examination that he had rendered an expert opinion that the Plaintiff's job at CSX had caused his CTS. Furthermore, Dr. Dwyer states in his Affidavit, "In my opinion, to a reasonable degree of medical certainty, Henry Williams' confirmed diagnosis of carpal tunnel syndrome is causally related to the performance of his duties as a conductor with CSX Transportation including the operation of poorly maintained equipment as described by plaintiff in his deposition." Dr. Dwyer has unambiguously stated that he is prepared to render an expert opinion regarding causation. The Defendant's argument is without merit and will be denied.

The Defendant's second argument is that insofar as Dr. Dwyer used Dr. Andres' report in formulating his conclusions, Dr. Dwyer's opinions are tainted and ought to be excluded as unreliable. For the reasons stated above, the Court finds that Dr. Andres' methodology is sound and his testimony admissible. Accordingly, the Court rejects the Defendant's "fruit of the poisonous

11

tree" argument as well. The Defendant's motion to exclude Dr. Dwyer's testimony is denied and its objections as to Dr. Dwyer's methodology go to its weight, not admissibility.

## CONCLUSION

For the reasons stated, the Court DENIES the Defendant's Motion in Limine to Exclude Testimony of Dr. Robert O. Andres and Dr. John J. Dwyer [DE 28].

SO ORDERED on August 23, 2005.

    S/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT